UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMIE DAVIS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03721-JMS-DLP |
| | ) | |
| METROPOLITAN PROPERTY AND CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

Plaintiff Jamie Davis worked as an Associate Claims Adjuster at Defendant Metropolitan Property and Casualty Insurance Company ("Met P&C"). In May 2018, shortly after requesting a sit-stand desk to accommodate her medical condition, Met P&C terminated her employment after an internal investigation revealed that Ms. Davis had a higher than usual number of disconnected calls with customers from July 2017 to mid-May 2018. Ms. Davis initiated this lawsuit against Met P&C, setting forth claims for discrimination and retaliation under the Americans With Disabilities Act, 42 U.S.C. § 12181, *et seq.* ("ADA"), and discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Met P&C has filed a Motion for Summary Judgment, [Filing No. 56], which is now ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether

a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    Ms. Davis's Position at Met P&C

Met P&C hired Ms. Davis on December 6, 1999, and she held various positions including Administrative Service Representative, Technical Assistant II, Customer Service Specialist-CS, Associate Claims Adjuster, Associate ARC Claims Adjuster, and Customer Service Specialist-CLM. [Filing No. 56-1 at 3; Filing No. 56-7 at 3.] From 2008 until her termination, Ms. Davis worked remotely from her home. [Filing No. 56-1 at 3-4.]

The last position that Ms. Davis held with Met P&C was as an Associate Claims Adjuster on the Adjuster Service Team ("AST"). [Filing No. 56-1 at 3; Filing No. 56-2 at 4; Filing No. 56-7 at 3.] In this position, Ms. Davis was responsible for answering customer calls to address concerns regarding insurance claims. [Filing No. 56-1 at 3; Filing No. 56-2 at 4; Filing No. 56-7 at 3.] Her primary responsibility was to take inbound customer service calls, but she did not take

claims adjusting calls, did not make outbound calls, and did not engage in ongoing handling of pending claims.  [Filing No. 56-7 at 3.]

> **B.      Ms. Davis's Requests for Leave**

Ms. Davis has several disabilities and medical conditions, and requested multiple short-term disability leaves in 2002, 2012, 2017, and 2018.  [Filing No. 56-1 at 7; Filing No. 56-2 at 35.] Met P&C never denied Ms. Davis's requests that were supported by the appropriate certifications. [Filing No. 56-1 at 7.]

> **C.      Ms. Davis's Requests for Accommodations**

In early 2017, Ms. Davis was transferred from the position of Associate Claims Adjuster AST to a position of Claims Adjuster with the Auto Resolution Center ("ARC").  [Filing No. 56-2 at 35-36; Filing No. 56-6 at 2.]  In her new role, Ms. Davis had her own files for which she was responsible, and was required to make liability decisions for those claims.  [Filing No. 56-6 at 2.] On April 3, 2017, Ms. Davis informed Met P&C that, due to her medical condition, she could not perform the duties of a Claims Adjuster ARC, and requested that she be permitted to transfer back to her position as Associate Claims Adjuster AST where she was not responsible for her own files, did not make liability determinations, and primarily handled inbound customer service calls. [Filing No. 56-1 at 36; Filing No. 56-2 at 35-36; Filing No. 56-2 at 60; Filing No. 56-6 at 3.]  Met P&C granted Ms. Davis's request, and Brenda Lawlor, Ms. Davis's direct supervisor, assisted with the accommodation process by ensuring that Ms. Davis was transferred back into the Associate Claims Adjuster AST role.  [Filing No. 56-1 at 12-14; Filing No. 56-1 at 46; Filing No. 56-2 at 35-36.]  Ms. Davis felt that she had a good working relationship with Ms. Lawlor, although she did not "know if [Ms. Lawlor] felt intimidated by [her] or what, but you could just tell that she didn't like [Ms. Davis]."  [Filing No. 56-1 at 14; Filing No. 56-1 at 31.]

Met P&C's Workplace Accommodations Program requires employees to submit a Workplace Accommodation Request Form when seeking a sit-stand desk due to a medical condition. [Filing No. 56-1 at 6-7; Filing No. 56-1 at 41.]  On May 3, 2018, Ms. Davis completed a Workplace Accommodation Request Form, in which she requested a sit-stand desk for her work station due to having had knee surgery and needing to stand frequently so that her knee was not "in a bent position all the time which causes pain." [Filing No. 56-1 at 37-39.]  Ms. Lawlor immediately forwarded Ms. Davis's request to Ms. Lawlor's supervisor and Ms. Davis's indirect supervisor, Anthony DeSimone.  [Filing No. 56-6 at 3.]  On May 4, 2018, Mr. DeSimone forwarded Ms. Davis's request to Met P&C's Claims Administrative Manager, Laura Mettes, for proper handling of the request. [Filing No. 56-7 at 3; Filing No. 56-7 at 9.]

Travelers Insurance ("Travelers") handles Met P&C's requests for accommodations relating to an employee's disability or medical condition, and on May 8, 2018, a Travelers representative emailed Ms. Davis and Ms. Lawlor requesting that Ms. Davis provide photographs of herself at her work station to assist with her request for a sit-stand desk.  [Filing No. 56-6 at 3; Filing No. 56-6 at 14.]  Ms. Davis responded by stating that it would be difficult for her to take photographs of herself at her work station, and Ms. Lawlor suggested that Ms. Davis have a family member or neighbor take photographs.  [Filing No. 56-6 at 4; Filing No. 56-6 at 14-15.]  Ms. Davis responded that her family members live an hour or more away from her, that they "all have jobs and very busy lives," that she would "figure it out," that there was "no need for [Ms. Lawlor] to be concerned about it," and that Ms. Davis would "handle it."  [Filing No. 56-6 at 4; Filing No. 56-6 at 14.]

Shortly after the email exchange regarding Travelers' request for photographs of Ms. Davis's work station, Ms. Davis sent Ms. Lawlor a Skype message stating that she knew what she

needed to do and would "figure it out," and telling Ms. Lawlor to "stay out of it." [Filing No. 56-6 at 4; Filing No. 56-6 at 20.]  Ms. Lawlor felt that Ms. Davis's comments were "rude and disrespectful." [Filing No. 56-2 at 10-11.]  Ms. Davis subsequently apologized to Ms. Lawlor for her comments, and Ms. Lawlor did not raise Ms. Davis's conduct with Employee Relations. [Filing No. 56-2 27.]  On May 8, 2018, Ms. Davis submitted the requested photographs to Travelers and Ms. Lawlor, and was informed that the photographs were sufficient. [Filing No. 63-3 at 3; Filing No. 63-3 at 26-27.]

Ms. Davis received every accommodation she requested, other than the sit-stand desk. [Filing No. 56-1 at 22.]  Met P&C actually approved Ms. Davis's request for a sit-stand desk, but Ms. Davis was terminated before she received the sit-stand desk. [Filing No. 56-7 at 3.]  Ms. Davis was told by "the person that ordered…supplies" in May of 2018 that the sit-stand desk had not yet been ordered. [Filing No. 63-1 at 66.]  But Ms. Davis was never told that Met P&C was denying her request for a sit-stand desk, or that it had changed its decision regarding a sit-stand desk. [Filing No. 56-1 at 21-22.]  Ms. Davis does not know whether anyone else on her team had a sit-stand desk. [Filing No. 56-1 at 16.]

### D.    Ms. Davis's Reviews

Ms. Davis received a positive evaluation for her performance in 2015, an on-target evaluation for her performance in 2016, and in 2017 she received all on-target results for her performance and several positive remarks from Ms. Lawlor. [Filing No. 63-1 at 24; Filing No. 63-1 at 33-34; Filing No. 63-1 at 41-42; Filing No. 63-1 at 105.]  In 2017, Ms. Davis received 100% on the portion of her review regarding customer surveys. [Filing No. 63-2 at 41; Filing No. 63-2 at 130-33.]

### E.      Ms. Davis's Technology Issues

In 2008, when Ms. Davis began working remotely from her home, she began experiencing issues with her phone.  [Filing No. 63-1 at 31; Filing No. 63-1 at 52; Filing No. 63-2 at 53-54; Filing No. 63-2 at 127-28.]  Ms. Davis was using a desk phone to answer calls instead of answering calls through the computer because customers could not hear her for the first two years.  [Filing No. 63-1 at 51; Filing No. 63-2 at 53-54; Filing No. 63-2 at 91; Filing No. 63-2 at 127.]  Associates would contact Laura Hartney, Met P&C's Senior Service Coordinator, if they were experiencing technological problems with their phone systems or their internet connections, but there were no written records kept of those contacts.  [Filing No. 56-5 at 5; Filing No. 63-6 at 10-12; Filing No. 63-6 at 19-20.]  Ms. Davis contacted Ms. Hartney several times regarding issues she was having with her phone system and internet connection.  [Filing No. 63-1 at 53; Filing No. 63-1 at 97.]  Ms. Davis had also contacted Met P&C's help desk to seek help with her technology issues.  [Filing No. 63-1 at 53; Filing No. 63-2 at 54-55; Filing No. 63-2 at 127.]  Ms. Davis was told that the issues she was experiencing were due to her internet connection.  [Filing No. 63-2 at 54; Filing No. 63-2 at 127-28.]  Met P&C was aware that employees, including Ms. Davis, were having issues with their internet connections at their home offices.  [Filing No. 63-6 at 19-20.]

Ms. Davis also reported her technology issues to Steve Bischel, her previous supervisor. [Filing No. 63-1 at 52; Filing No. 63-2 at 54; Filing No. 63-2 at 127-28.]  Mr. Bischel confirmed that in 2008 some employees who started working remotely from home were experiencing issues and the fix put in place was providing a desk phone, which Ms. Davis had.  [Filing No. 63-1 at 51; Filing No. 63-2 at 56; Filing No. 63-2 at 127-28.]  Technology problems and dropped calls were discussed several times during daily team meetings, and several employees experienced issues with dropped calls and discussed their issues during the team meetings.  [Filing No. 63-1 at 27-31;

Filing No. 63-1 at 73; Filing No. 63-2 at 28.]  Ms. Davis discussed her own issues with dropped calls during the team meetings on multiple occasions.  [Filing No. 63-1 at 29-30.]  Ms. Davis and other employees were informed that Met P&C was working on the technology issues following discussions about dropped calls.  [Filing No. 63-1 at 31.]

### F.   Met P&C Conducts An Internal Audit of Disconnected Calls

Emily Landherr, Met P&C's Claims Solution Team Manager, was responsible for creating work schedules for adjusters and for monitoring adjusters' customer service calls to ensure that there are no irregularities.  [Filing No. 56-4 at 8; Filing No. 56-8 at 2.]  Ms. Landherr worked with Met P&C's service provider, AT&T, to monitor customer calls and to ensure that Met P&C provided satisfactory customer service.  [Filing No. 56-4 at 10; Filing No. 56-4 at 18-20; Filing No. 56-8 at 2.]

In early 2018, Ms. Landherr discovered that adjusters were not answering phones promptly and that customers were often being placed on hold for long periods of time.  [Filing No. 56-8 at 2.]  In late April to early May of 2018, Ms. Landherr worked with AT&T to conduct an internal workforce audit that generated reports of customer service calls showing when the adjuster disconnected the calls.  [Filing No. 56-8 at 2-3.]  The internal workforce audit was aimed at learning what Met P&C could do to become more efficient and to provide satisfactory customer service.  [Filing No. 56-8 at 3.]

As part of the internal audit, Ms. Landherr reviewed phone reports of calls disconnected by the adjuster in under twenty seconds, because it is unlikely that a customer can be serviced in under twenty seconds unless the adjuster is answering a relatively simple question.  [Filing No. 56-8 at 3.]  Ms. Landherr also reviewed reports of calls under ten seconds, because she believed it was not possible to service a customer in under ten seconds.  [Filing No. 56-8 at 3.]  The phone

reports revealed that in 2018, Ms. Davis had significantly more disconnected calls under ten seconds than any other adjuster.  [Filing No. 56-8 at 3.]

Ms. Landherr also listened to numerous customer service calls under ten seconds involving Ms. Davis, and she heard the customer saying "hello," then heard Ms. Davis disconnect the line without saying anything.  [Filing No. 56-8 at 3.]  The phone reports and audio recordings indicated to Ms. Landherr that Ms. Davis had disconnected hundreds of customer calls without servicing the customers.  [Filing No. 56-8 at 3.]  If a customer service call is disconnected, the customer is routed to a different adjuster when he or she calls back, allowing the employee who received the first call to completely avoid servicing the customer.  [Filing No. 56-8 at 3.]  Ms. Davis agrees that hanging up on customers or abandoning calls would violate Met P&C's policy.  [Filing No. 56-1 at 7.]  During the time that Ms. Landherr conducted the internal audit, she had never met Ms. Davis, was not aware of Ms. Davis's requests for accommodations, and was not involved in Ms. Davis's request for a sit-stand desk.  [Filing No. 56-4 at 56-61; Filing No. 56-8 at 3.]  Ms. Landherr also was not aware of Ms. Davis's technology setup in her home office, and never inquired regarding her setup.  [Filing No. 63-4 at 62-63.]

On May 9, 2018, one day after Ms. Davis had submitted her work station photographs to Travelers to support her request for a sit-stand desk, Ms. Landherr informed Mr. DeSimone of Ms. Davis's high volume of disconnected calls and provided screenshots of phone reports reflecting Ms. Davis's customer service calls under twenty seconds that took place in April and May of 2018.[1]  [Filing No. 56-4 at 18; Filing No. 56-4 at 77-85; Filing No. 56-7 at 4; Filing No. 56-8 at 4.]  Mr.

---

[1] Ms. Landherr testified that when she would discover a high number of short calls for an employee, she would report that to the Director.  [Filing No. 63-4 at 28.]  Ms. Landherr did not follow this procedure for Ms. Davis, instead reporting the disconnected calls directly to Mr. DeSimone, who is not a Director.  [Filing No. 63-4 at 29.]

DeSimone then informed Ms. Lawlor of the issue, and they worked with Met P&C's Employee Relations Specialist to further investigate Ms. Davis's high volume of disconnected calls. [Filing No. 56-7 at 4.][2]  When Ms. Lawlor first received the information from Mr. DeSimone, she did not think Ms. Davis would "do that." [Filing No. 56-2 at 12.]  Although Met P&C's protocol in investigating short calls included verifying that there were no system issues causing the problem, Ms. Lawlor never checked Ms. Davis's equipment to look for technology issues even though she knew that Ms. Lawlor had complained about those issues. [Filing No. 63-2 at 88-91; Filing No. 63-2 at 95-96; Filing No. 63-2 at 109; Filing No. 63-2 at 147.]

Ms. Hartney told Ms. Lawlor during the investigation that there was a delay for Ms. Davis on the system due to speed. [Filing No. 63-2 at 59-60; Filing No. 63-2 at 128.]  Specifically, Ms. Hartney informed Ms. Lawlor that Ms. Davis was in "telecomputer mode," and needed to "put [her] phone in ACW or Aux before ending call[s] and then go back in available mode so the system can catch up." [Filing No. 63-2 at 128.]  Ms. Lawlor was aware of a system change that affected the way Ms. Davis received calls, but did not investigate to determine whether this was the cause of the dropped calls. [Filing No. 63-2 at 115-16.]

When Ms. Landherr was running reports and listening to calls for scheduling purposes, she discovered that simple customer needs could be serviced in a 20-second call. [Filing No. 63-4 at 11-12; Filing No. 63-4 at 36-37.]  Ms. Lawlor's investigation focused on calls that were 20 seconds or less. [Filing No. 63-2 at 48-49; Filing No. 63-2 at 127-28.]  On the recorded calls, sometimes Ms. Davis can be heard speaking and sometimes she cannot. [Filing No. 63-2 at 25.]  It is not

---

[2] Ms. Lawlor also raised an issue regarding a discrepancy with Ms. Davis's timesheet with Mr. DeSimone, [Filing No. 63-3 at 3; Filing No. 63-3 at 34-40], and Employee Relations opened an investigation into the timesheet issue, [Filing No. 63-2 at 74-77; Filing No. 63-2 at 147], nothing came of the timesheet investigation, and no further action was taken regarding that issue, [Filing No. 63-2 at 74-77; Filing No. 63-2 at 147].

possible to tell from the recordings whether or not Ms. Davis could hear the customer speaking. [Filing No. 63-2 at 23-24.] Ms. Lawlor did not know whether Ms. Davis was intentionally hanging up on customers or not. [Filing No. 63-2 at 79-80.] Met P&C's system had no way of indicating whether a disconnected call was intentionally ended by Ms. Davis. [Filing No. 63-6 at 27-28; Filing No. 63-6 at 35-36; Filing No. 63-6 at 43.]

On May 10, 2018, Mr. DeSimone contacted Ms. Hartney for assistance with the investigation. [Filing No. 56-4 at 10; Filing No. 56-5 at 5.] Ms. Hartney generated phone reports showing calls under twenty seconds disconnected by Ms. Davis and other adjusters, and listened to several of Ms. Davis's calls, as well as calls involving other adjusters. [Filing No. 56-5 at 24; Filing No. 56-5 at 32; Filing No. 56-7 at 4.] In listening to the recorded calls, Ms. Hartney heard the customer say "hello," but never heard any response from Ms. Davis before disconnecting the calls. [Filing No. 56-5 at 24; Filing No. 56-5 at 32; Filing No. 56-7 at 4.] Ms. Hartney listened to disconnected calls involving other adjusters, and during those calls she heard the adjusters attempting to respond to the customer before disconnecting the call. [Filing No. 56-5 at 24; Filing No. 56-5 at 32; Filing No. 56-7 at 4.] Ms. Hartney informed Mr. DeSimone that she was "certain" the disconnected calls involving Ms. Davis were agent disconnects, meaning that Ms. Davis had disconnected the call. [Filing No. 56-3 at 8; Filing No. 56-5 at 16-17; Filing No. 56-5 at 32.]

Ms. Lawlor also reviewed phone reports for 2018, reviewed Ms. Davis's customer service calls under twenty seconds, and listened to Ms. Davis's calls that were only a few seconds long to determine whether Ms. Davis was intentionally disconnecting customer calls. [Filing No. 56-2 at 13; Filing No. 56-6 at 5.] Ms. Lawlor identified the following disconnected calls that lasted under twenty seconds and involved Ms. Davis:

11

- 144 calls in January 2018;

- 150 calls in February 2018;

- 95 calls in April 2018; and

- 69 calls from May 1 to May 15, 2018.

[Filing No. 56-6 at 5.]  Ms. Davis was on medical leave in March 2018, and did not have any customer calls for that month.  [Filing No. 56-6 at 5.]

### G.    Met P&C Meets With Ms. Davis Regarding the Audit Results

On May 16, 2018, Ms. Lawlor and Mr. DeSimone met with Ms. Davis about her high volume of disconnected calls, and Ms. Davis stated that she was aware of the disconnected calls and claimed that she had technical issues with her phone and had reported the issues in the past. [Filing No. 56-7 at 5.]  Ms. Davis asked Ms. Lawlor and Mr. DeSimone why she was never informed of the high number of short calls, and Mr. DeSimone said "[w]e don't have to tell you that."  [Filing No. 63-1 at 87-89.]  During the May 16, 2018 conversation, Mr. DeSimone also brought up Ms. Davis's prior position change, which was unrelated to the issue they were discussing and took Ms. Davis by surprise.  [Filing No. 63-1 at 89-90.]  However, Ms. Davis had no reason to believe that Mr. DeSimone was bringing up her disability when he brought up the position change.  [Filing No. 63-1 at 89-90.]  Ms. Lawlor and Mr. DeSimone first discussed the possibility of terminating Ms. Davis with each other on May 16, 2018.  [Filing No. 63-2 at 67; Filing No. 63-2 at 127-28.]

Prior to the May 16, 2018 conversation, Ms. Davis had never seen or spoken to Mr. DeSimone.  [Filing No. 56-1 at 17.]  Although Ms. Davis stated that she was aware calls were disconnecting, she never raised the issue with Ms. Lawlor or Mr. DeSimone, and Ms. Lawlor had no knowledge of the issue.  [Filing No. 56-1 at 17; Filing No. 56-2 at 23-24; Filing No. 56-2 at 37-

38.] Mr. DeSimone was concerned that Ms. Davis had not immediately brought technical issues to her supervisor. [Filing No. 56-3 at 17-19.] Mr. DeSimone told Ms. Davis to order and use a headset for answering phone calls, she did so, and the number of short calls she had decreased once she began using the headset. [Filing No. 63-1 at 54-55; Filing No. 63-1 at 85-87.] Following the initial conversation with Mr. DeSimone and Ms. Lawlor about short calls, Ms. Davis reported to Ms. Lawlor about a call where she could not hear the customer, but Ms. Lawlor never investigated that specific call or situation. [Filing No. 63-2 at 57-58.] Ms. Lawlor never received a complaint from a customer regarding Ms. Davis hanging up on them during a telephone call. [Filing No. 63-2 at 72.]

### H.    Met P&C Investigates Whether Ms. Davis Reported Technology Issues

After the May 16, 2018 conversation, Mr. Bischel informed Ms. Lawlor that he did not remember Ms. Davis telling him about any technological issues with her phone which caused customer calls to disconnect. [Filing No. 56-2 at 17-18; Filing No. 56-2 at 24; Filing No. 56-2 at 49.] Mr. Bischel also told Ms. Lawlor that he had verbally reprimanded Ms. Davis due to her inability to increase her number of customer calls and decrease her talk time per call, and Mr. Bischel told Ms. Lawlor that intentionally disconnecting calls would accomplish improvement in both areas. [Filing No. 56-2 at 17-18; Filing No. 56-2 at 50.]

Both Ms. Landherr and Ms. Hartney contacted Met P&C's Help Desk and were not able to verify that Ms. Davis had reported technological issues with her phone causing customer calls to disconnect. [Filing No. 56-2 at 24; Filing No. 56-2 at 49; Filing No. 56-2 at 52; Filing No. 56-4 at 61-62; Filing No. 56-4 at 69-71; Filing No. 56-5 at 28-29; Filing No. 56-7 at 5.]

### I.    Met P&C Discovers Disconnected Calls in 2017

On May 18, 2018, Mr. DeSimone and Ms. Lawlor again discussed terminating Ms. Davis. [Filing No. 63-2 at 101-02; Filing No. 63-2 at 147.]  Ms. Lawlor then generated a report for 2017 and found the following disconnected calls involving Ms. Davis:

- 119 calls in July 2017;

- 144 calls in August 2017;

- 164 calls in September 2017;

- 174 calls in October 2017;

- 138 calls in November 2017; and

- 149 calls in December 2017.

[Filing No. 56-2 at 33; Filing No. 56-4 at 87-89; Filing No. 56-6 at 5.]  Shortly thereafter, Ms. Lawlor discovered that, since confronting Ms. Davis about the calls, the amount of disconnected calls to Ms. Davis in May 2018 had drastically decreased from previous months, which indicated to Ms. Lawlor that Ms. Davis had intentionally disconnected customer calls before the May 16, 2018 meeting, rather than having technological issues with her phone.  [Filing No. 56-2 at 30; Filing No. 56-4 at 86; Filing No. 56-6 at 5-6.]

### J.    Met P&C Terminates Ms. Davis's Employment

On May 31, 2018, Ms. Lawlor and Mr. DeSimone informed Ms. Davis that their investigation did not find any instances in which Ms. Davis had reported technology issues with her phone resulting in disconnected calls.  [Filing No. 56-6 at 6.]  Ms. Davis did not explain why there were hundreds of disconnected calls in 2017 and 2018, or why she never reported the issue to her supervisors.  [Filing No. 56-6 at 6.]  Ms. Lawlor and Mr. DeSimone concluded that even if Ms. Davis did not intentionally disconnect customer calls, she admitted that she was aware that

her customer calls were disconnecting, and there was no record of her reporting the issue to management so her actions constituted call avoidance and call abandonment. [Filing No. 56-6 at 6; Filing No. 56-7 at 6.]

Ms. Lawlor also noted that not only were there a high volume of disconnected calls each month, but that the cumulative number of disconnected calls and the length of time they had occurred had the potential of negatively impacting hundreds of customers and, in turn, Met P&C's business. [Filing No. 56-2 at 8; Filing No. 56-6 at 6.] Further, Ms. Davis's primary role was to answer inbound customer calls and, despite this limited set of responsibilities, Ms. Lawlor determined that Ms. Davis neglected to perform her job duties. [Filing No. 56-6 at 6.] Ms. Lawlor also determined that Ms. Davis was not credible, since Mr. Bischel and the results of the internal investigation did not support her explanation for the disconnected calls – i.e., that she had technological issues. [Filing No.56-6 at 6.] As a result, Ms. Lawlor and Mr. DeSimone informed Ms. Davis on May 31, 2018 that she was being terminated due to call abandonment and call avoidance. [Filing No. 56-7 at 6.] Ms. Davis had not previously been disciplined, and was not offered progressive discipline prior to her termination. [Filing No. 63-2 at 86; Filing No. 63-5 at 22; Filing No. 63-5 at 29.]

### K.   Other Met P&C Employees Are Disciplined for Disconnected Calls

After determining that Ms. Davis had the highest number of disconnected calls in Mr. DeSimone's group of employees, Ms. Landherr also informed Ms. DeSimone that two other claims adjusters, Shailesh Shirole and Mike Candella, had a high volume of calls that had been disconnected within twenty seconds – although a lower volume than Ms. Davis. [Filing No. 56-3 at 4-6; Filing No. 56-7 at 6.] Specifically, in 2018 Ms. Davis averaged 135.5 disconnected calls per month, while Ms. Shirole averaged 81.8 and Mr. Candella averaged 50.4. [Filing No. 56-7 at

6.]  Neither Ms. Shirole nor Mr. Candella directly reported to Ms. Lawlor, as Ms. Davis had. [Filing No. 56-7 at 6.]

Ms. Shirole had already been given a final written warning when Met P&C conducted the internal audit regarding disconnected calls, and Mr. DeSimone participated in the decision to terminate Ms. Shirole's employment effective July 13, 2018, for call avoidance and call abandonment.  [Filing No. 56-7 at 6.]  Mr. DeSimone also participated in the decision to issue a final written warning to Mr. Candella related to the disconnected calls, and later terminated Mr. Candella's employment due to continued performance issues.  [Filing No. 56-7 at 6.]  While Ms. Davis was primarily responsible for inbound customer calls and for assisting claims adjusters, Ms. Shirole and Mr. Candella were claims adjusters responsible for handling ongoing pending claims, answering inbound and making outbound calls regarding claims adjusting, and making liability determinations.  [Filing No. 56-7 at 7.]  Mr. DeSimone did not consider Ms. Shirole's or Mr. Candella's conduct to be as severe as Ms. Davis's.  [Filing No. 56-7 at 7.]

### L.    The Lawsuit

After Ms. Davis filed a Charge of Discrimination with the Equal Employment Opportunity Commission which included allegations of discrimination and retaliation in violation of the ADA and the ADEA, [*see* Filing No. 1-1 at 26; Filing No. 10 at 3-4], Ms. Davis filed this lawsuit against Met P&C in Marion Superior Court, [Filing No. 1-1 at 23-29].  Met P&C removed the case to this Court on the basis of federal question jurisdiction, [Filing No. 1], and subsequently moved for summary judgment on all of Ms. Davis's claims, [Filing No. 56].

## III.
### DISCUSSION

#### A.    ADEA Discrimination Claim

At the outset, the Court notes that Ms. Davis did not respond to Met P&C's arguments regarding her ADEA discrimination claim, [*see* Filing No. 64], and has therefore waived any opposition to those arguments.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver"); *Laborers' Inter. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of [her] claims").  Consequently, the Court **GRANTS** Met P&C's Motion for Summary Judgment on Ms. Davis's ADEA discrimination claim.

#### B.    ADA Discrimination Claim

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "The ADA then defines 'discriminate against a qualified individual on the basis of disability' to include disparate treatment and failure to accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)).  Ms. Davis asserts both disparate treatment and failure to accommodate

allegations in connection with her ADA discrimination claim, and the Court addresses each theory in turn.

          *1.    Disparate Treatment*

In support of its Motion for Summary Judgment, Met P&C argues that Ms. Davis has not established a prima facie case of discrimination based on disparate treatment because she has not presented evidence that a similarly situated, non-disabled employee was treated more favorably than she was.  [Filing No. 59 at 18.]  Specifically, it argues that Ms. Shirole and Mr. Candella are not similarly situated to Ms. Davis because Ms. Davis "had a disproportionately higher amount of disconnected calls" than they did, and because both of those individuals had "more complex roles" than Ms. Davis.  [Filing No. 59 at 19-20.]  Met P&C also contends that Ms. Shirole and Mr. Candella were not treated more favorably than Ms. Davis, as Ms. Shirole was terminated for disconnected calls and continued performance issues and Mr. Candella was given a final written warning for disconnected calls and later terminated due to continued performance issues.  [Filing No. 59 at 20.]  Met P&C asserts that even if Ms. Davis could establish a prima facie case, she has not shown that Met P&C's reason for terminating her was pretext for illegal discrimination.  [Filing No. 59 at 20-24.]  It argues that Ms. Davis was terminated for call abandonment, which she admits is conduct that violates Met P&C's policy, and outlines its investigation into the disconnected calls.  [Filing No. 59 at 20-21.]  Met P&C points out that Ms. Landherr discovered the disconnected calls, and had never met Ms. Davis, was not aware of Ms. Davis's requests for accommodations, and was not involved in any of Ms. Davis's requests for accommodations.  [Filing No. 59 at 23.]  It also argues that no reasonable jury could conclude that Ms. Lawlor and Mr. DeSimone are lying about the reason for Ms. Davis's termination, and that "[b]ecause Met P&C honestly believed that Ms. Davis committed call abandonment and call avoidance, even if its belief is mistaken, [Ms.]

Davis's claim fails as a matter of law." [Filing No. 59 at 23-24.] Finally, it argues that, as a whole, Ms. Davis "fails to proffer any evidence that her disability had anything to do with her termination, much less that she would not have been terminated but-for her disability." [Filing No. 59 at 24-25.]

In her response, Ms. Davis argues that there is sufficient evidence from which a reasonable jury could conclude that she faced disparate treatment and was terminated because of her disability. [Filing No. 64 at 20-21.] Ms. Davis contends that there are "strong inferences" that Mr. DeSimone and Ms. Lawlor sought out reasons to terminate her following her request for a sit-stand desk, pointing to Mr. DeSimone's reference to her "disability accommodation history" during the meeting to discuss the disconnected calls. [Filing No. 64 at 20.]

In its reply, Met P&C asserts that "[i]t is undisputed that [Mr.] DeSimone and [Ms.] Lawlor gave [Ms.] Davis an opportunity to provide an explanation for her disconnected calls, conducted a thorough investigation, and found that even if [Ms.] Davis did not intentionally disconnect the calls, [Ms.] Davis was aware of the issue and failed to report it to management." [Filing No. 68 at 18.]

A claim for disparate treatment under the ADA "requires proof that: (1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)). A plaintiff asserting a discrimination claim under the ADA may proceed under the approach outlined by the Seventh Circuit Court of Appeals in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016), where the question is "'whether the evidence [considered as a whole] would permit a reasonable factfinder to conclude'" that Ms. Davis

was terminated due to her disability. *Castetter*, 953 F.3d at 996 (quoting *Ortiz*, 834 F.3d at 765).

*Ortiz* dispensed with the old "direct- and indirect-framework" as it relates to the "proposition that

evidence must be sorted into different piles, labeled 'direct' and 'indirect.'" 834 F.3d at 766. To

show that discrimination was the "but for" cause of an adverse employment action, a plaintiff can

point to direct evidence, such as an admission, or to circumstantial evidence, which includes: "(1)

suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected

group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the

protected group systematically receive[d] better treatment; and (4) evidence that the employer

offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trustees of

Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Additionally, the Seventh Circuit has not entirely done away with separate tests or methods

to analyze discrimination cases, and it has stated that "the well-known and oft-used *McDonnell

Douglas* framework for evaluating discrimination remains an efficient way to organize, present,

and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892

F.3d 887, 894 (7th Cir. 2018); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360,

368 (7th Cir. 2019). Under the *McDonnell Douglas* framework, a plaintiff must show that "(1)

[she] is disabled under the ADA; (2) [she] was meeting [her] employer's legitimate employment

expectations; (3) [she] suffered an adverse employment action; and (4) similarly situated

employees without a disability were treated more favorably." *Dickerson*, 657 F.3d at 601. "Once

a plaintiff has established a *prima facie* case, the defendant must identify a legitimate non-

discriminatory reason for its employment decision. If the defendant satisfies this requirement, the

plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are

pretextual." *Id.* (citation omitted).

In order to show pretext, "[a] plaintiff must point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations and citations omitted). "Merely disagreeing with an employer's reasons does not meet this standard." *Id.*

The Court assumes, without deciding, that Ms. Davis has set forth a prima facie case of discrimination under the ADA, and jumps directly to the issue of pretext. Met P&C's purported legitimate, non-discriminatory reason for terminating Ms. Davis is that after discovering that Ms. Davis had an unusually high number of disconnected calls, it investigated and determined that it was likely Ms. Davis had disconnected the calls and that, even if she had not intentionally disconnected the calls, she knew about the disconnected calls but had not reported any technological issues to her supervisor. Ms. Davis argues that this reason is pretextual because her termination came just days after she requested a sit-stand desk.

While it is true that evidence of pretext, coupled with evidence of suspicious timing, can create a genuine issue of material fact for a discrimination claim, *Coleman v. Donahoe*, 667 F.3d 835, 860-62 (7th Cir. 2012), that is not the situation here. Ms. Davis has not shown that Met P&C's reason for terminating her is pretextual. Ms. Davis attempts to show that Met P&C did not adequately investigate the disconnected calls, and that it sought out a reason to fire her. For example, she presents evidence that Met P&C never checked her equipment to make sure there were no technology issues, that a system change may have caused issues with disconnected calls, that it was not clear whether Ms. Davis intentionally disconnected the calls, and that Ms. Davis had raised issues with disconnected calls in team meetings and to certain individuals. But a finding of pretext "concerns whether the stated reason was not merely erroneous or unfair, but a lie." *King*

21

*v. Ford Motor Co.*, 872 F.3d 833, 843 (7th Cir. 2017).  While Ms. Davis's evidence may show that the investigation into the disconnected calls could have been more thorough, it does not show that the reason for her termination was pretextual.

Ms. Davis also relies on her contention that, out of the blue, Mr. DeSimone brought up her disability and request for a position change during a May 30, 2018 meeting to discuss the disconnected calls.  But Ms. Davis's argument is counter to her sworn testimony.  She did not testify that Mr. DeSimone specifically brought up her disability or request for an accommodation. Instead, she testified that Mr. DeSimone referenced her not wanting to be a claims adjuster.  [Filing No. 63-1 at 89-90.]  And, when asked whether there was any reason to think that Mr. DeSimone was referring to her disability when he made that comment, Ms. Davis said she did not know what Mr. DeSimone was thinking.  [Filing No. 63-1 at 90.]  Ms. Davis simply has not provided any evidence that Met P&C's stated reason for terminating her – that she engaged in call abandonment and call avoidance – was a pretext for discrimination based on her disability.

Ms. Davis also emphasizes that she had not been disciplined and was terminated instead of being given progressive discipline.  But Mr. DeSimone explained that he considered Ms. Davis's conduct to be more serious than other employees with disconnected calls, given that one of Ms. Davis's primary duties was to answer inbound customer calls.  The lack of progressive discipline does not show that terminating Ms. Davis was a pretext for discrimination.

Additionally, Ms. Davis's claim that her termination was suspiciously close in timing to her request for a sit-stand desk is not supported by the evidence.  Ms. Davis first requested a sit-stand desk on May 3, 2018, and Travelers reached out to Ms. Davis on May 8, 2018 regarding obtaining photographs of her work station.  Ms. Landherr – who had never met Ms. Davis, was not aware of Ms. Davis's request for accommodations, and was not involved in Ms. Davis's request

for a sit-stand desk – began her internal audit in early 2018. Ms. Landherr informed Mr. DeSimone of Ms. Davis's high volume of disconnected calls on May 9, 2018, but still did not know about Ms. Davis's request for a sit-stand desk. Without evidence contradicting Ms. Landherr's testimony that she was unaware of Ms. Davis's disability or request, the Court cannot conclude anything other than that the close timing was coincidental. There simply is no evidence that Met P&C drummed up the disconnected calls issue as a result of Ms. Davis's request for a sit-stand desk. And, most tellingly, it is undisputed that Travelers and Met P&C approved Ms. Davis's request for a sit-stand desk. The only reason that Ms. Davis did not receive the sit-stand desk is that she was terminated for call avoidance and call abandonment before the desk arrived.

In sum, even assuming that Ms. Davis has set forth a prima facie case of ADA discrimination based on disparate treatment, Met P&C has set forth a legitimate, non-discriminatory reason for Ms. Davis's termination and she has not provided evidence indicating that the reason was a pretext for discrimination based on her disability. The Court **GRANTS** Met P&C's Motion for Summary Judgment on Ms. Davis's ADA discrimination claim for disparate treatment.

### 2.    *Failure to Accommodate*

Met P&C argues that Ms. Davis's failure to accommodate claim fails as a matter of law because it is undisputed that Met P&C granted all of Ms. Davis's accommodation requests during her employment. [Filing No. 59 at 25.] It notes that Ms. Davis was granted multiple short-term disability leaves during her employment, that it granted her request to return to her position as Associate Claim Adjuster AST, and that it granted her request for a sit-stand desk but "her termination intervened, and so she did not ultimately receive the desk." [Filing No. 59 at 25-26.]

In response, Ms. Davis acknowledges that her failure to accommodate claim is limited to her request for a sit-stand desk, and argues that it is undisputed that she never received the sit-stand desk, and that she was terminated so that Met P&C would not have to order and provide the sit-stand desk. [Filing No. 64 at 21-22.] Ms. Davis also contends that she was told that the sit-stand desk was never ordered. [Filing No. 64 at 21-22.]

In its reply, Met P&C argues that Mr. DeSimone and Ms. Lawlor made sure that Ms. Davis's request for a sit-stand desk was forwarded to the appropriate individuals, that Travelers contacted Ms. Davis regarding her request, that Ms. Lawlor attempted to assist Ms. Davis in responding to Travelers' request for photographs of her work station, and that Met P&C had no control over how quickly Travelers ordered the sit-stand desk. [Filing No. 68 at 18-19.]

Ms. Davis's failure to accommodate claim is based only on her request for a sit-stand desk. [*See* Filing No. 64 at 21 (Ms. Davis stating in her response brief that she "does not dispute that [Met P&C] accommodated her requests prior to the sit-stand desk at issue in this litigation," and that "those prior accommodations are not at issue in this litigation and have no relation to the denial of the sit-stand desk accommodation").]   "A claim for failure to accommodate under the ADA…requires proof [that] (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of [her] disability; and (3) defendant failed to accommodate [her] disability reasonably." *Scheidler*, 914 F.3d at 541 (emphasis omitted).

Here, the evidence shows that Met P&C reasonably accommodated Ms. Davis's disability. Ms. Davis requested the sit-stand desk, Met P&C helped her contact the appropriate individuals, and Met P&C attempted to help her provide Travelers with photographs of her work station.  While Ms. Davis testified that "the person that ordered…supplies" told her in May of 2018 that the sit-stand desk had not yet been ordered, she also acknowledged that no one ever told her Met P&C

had denied her request for a sit-stand desk or changed its decision regarding providing a sit-stand desk. [Filing No. 63-1 at 66-67.] And, even if the sit-stand desk had not been ordered in May 2018, Ms. Davis has not presented any evidence that this was because Met P&C had decided not to provide the desk. Instead, the evidence indicates that Ms. Davis was terminated for call avoidance and call abandonment – reasons unrelated to her request – before the sit-stand desk was ordered and/or before it arrived.

Because Ms. Davis has not presented evidence from which a reasonable jury could conclude that Met P&C failed to accommodate Ms. Davis's request for a sit-stand desk, the Court **GRANTS** Met P&C's Motion for Summary Judgment on her claim for ADA discrimination based on a failure to accommodate.

### C.      ADA Retaliation Claim

In support of its Motion for Summary Judgment, Met P&C argues that Ms. Davis has not set forth a prima facie case of ADA retaliation because she has not shown that a similarly situated, non-disabled employee was treated more favorably. [Filing No. 59 at 27.] Met P&C also argues that Ms. Davis has not presented evidence that its reason for terminating her was pretext for illegal retaliation. [Filing No. 59 at 28-30.] Specifically, Met P&C contends that Ms. Davis has not shown that her request for a sit-stand desk caused her termination, noting that Ms. Landherr did not know about Ms. Davis's disability or her request for a sit-stand desk when she informed Mr. DeSimone of Ms. Davis's high volume of disconnected calls. [Filing No. 59 at 28.] It asserts that Ms. Landherr "independently discovered [Ms.] Davis'[s] high volume of disconnected calls as part of her regular job duties for Met P&C, wholly apart from [Ms.] Davis'[s] request for the sit-stand desk." [Filing No. 59 at 28.] Met P&C argues that the timing of Ms. Davis requesting the sit-stand desk on May 3, the investigation into the disconnected calls beginning on May 9, and Ms.

Davis's termination on May 31 does not establish retaliation, and that Ms. Landherr's involvement "breaks any chain of causation." [Filing No. 59 at 29.] Met P&C contends that "no reasonable jury could conclude that Met P&C would harbor animus toward employees who request sit-stand desks, when they created an entire process and forms specially designed for these types of requests." [Filing No. 59 at 29.]

In her response, Ms. Davis argues that it is telling that her "nearly two-decade career with [Met P&C] ended abruptly in less than 30 days from her request for the sit-stand desk accommodation." [Filing No. 64 at 13.] Ms. Davis points to her positive performance evaluations, notes that Ms. Lawlor found Ms. Davis's email on May 8, 2018 "rude and disrespectful," and states that "[t]he very next day, out of the blue, [Ms.] Landherr allegedly and suddenly discovered this high number of short calls for which [Ms. Davis] was allegedly responsible for and began feeding information about it to [Mr.] DeSimone." [Filing No. 64 at 13 (emphasis omitted).] She contends that Ms. Lawlor and Mr. DeSimone began talking about terminating her just two days later, and that she had not been disciplined before. [Filing No. 64 at 13.] Ms. Davis also points to evidence that she characterizes as contradictory regarding how long Met P&C had been running reports reflecting disconnected calls. [Filing No. 64 at 14.] Ms. Davis argues that Ms. Shirole and Mr. Candella are similarly situated and were treated more favorably, and that she has presented evidence that Met P&C's reasons for terminating her were a pretext for discrimination based on her disability. [Filing No. 64 at 16-19.] She again argues that Met P&C could not determine whether Ms. Davis was disconnecting the calls, and contends that she did report issues with dropped calls and her technology on multiple occasions. [Filing No. 64 at 16-17.] Ms. Davis contends that there are inconsistencies in Met P&C's witnesses' testimony, including that: (1) Ms. Landherr testified that she was running reports on call length because she was working on

scheduling for the claims adjusters, but then never changed the schedule after discovering the high number of short calls among employees; (2) Mr. DeSimone and Ms. Lawlor testified that Ms. Landherr was part of a workforce audit group, but Ms. Landherr testified that no such group existed; and (3) Ms. Landherr deviated from protocol by reporting the issues with Ms. Davis's disconnected calls directly to Mr. DeSimone.  [Filing No. 64 at 17.]  Ms. Davis argues further that no one looked into her technology issues, and that a reasonable jury could conclude that Met P&C's investigation into the disconnected calls was a sham.  [Filing No. 64 at 18.]  Finally, Ms. Davis points to records indicating that the original concern was a timesheet discrepancy, that nothing came of that issue, but that Met P&C then turned its attention to the disconnected calls issue. [Filing No. 64 at 18.]

In its reply, Met P&C argues that the timing of its investigation is not suspicious because Ms. Landherr, who initiated the investigation, had no prior dealings with Ms. Davis and did not know that she had requested a sit-stand desk.  [Filing No. 68 at 10.]  Met P&C also asserts that the evidence is not contradictory, and shows that Ms. Landherr first started generating reports of disconnected calls in May 2018, and Met P&C continued to do so thereafter "to ensure the issue did not happen again."  [Filing No. 68 at 10.]  Met P&C reiterates its argument that Ms. Shirole and Mr. Candella are not similarly situated to Ms. Davis, and also argues that Ms. Davis has failed to demonstrate pretext.  [Filing No. 68 at 11-18.]

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."  42 U.S.C. § 12203(b). A claim of retaliation under the ADA requires proof that "[the plaintiff] engaged in protected

activity, that she suffered an adverse action, and that there is a causal connection between the two." *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).  The retaliation must be "a but-for cause of the adverse employment action."  *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 963 (7th Cir. 2010).

At issue in this case is the causation element, which requires Ms. Davis to "demonstrate a triable issue as to whether discrimination motivated [her termination]."  *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).  Again, under *Ortiz*, the Court considers the evidence as a whole, without categorizing it as "direct" or "indirect" evidence.  *Ortiz*, 834 F.3d at 765.  Additionally, Ms. Davis may proceed under the *McDonnell Douglas* framework.  *Rowlands*, 901 F.3d at 801.  Ms. Davis points to circumstantial evidence which she claims creates a genuine issue of material fact regarding whether her request for a sit-stand desk was the cause of her termination.  But, as discussed above, none of that evidence could lead a reasonable jury to conclude that Met P&C's decision to terminate Ms. Davis was because she had requested a sit-stand desk, or that Met P&C's reason for terminating her was a pretext for retaliation based on her request for a sit-stand desk.  Significantly, it is undisputed that Ms. Landherr did not know Ms. Davis, did not know that Ms. Davis had a disability, did not know that Ms. Davis had requested a sit-stand desk, and was not involved in evaluating Ms. Davis's request for a sit-stand desk when she ran the first report regarding disconnected calls.  Further, Mr. Bischel had told Ms. Lawlor that he had verbally reprimanded Ms. Davis regarding her inability to increase the number of customer calls she took and to decrease her talk time per call.  He also told Ms. Lawlor that disconnecting calls would improve both of these measures.  And while Ms. Davis had received positive performance reviews in the past, she agreed that disconnecting calls would be a violation of Met P&C policy.

28

The other pieces of evidence Ms. Davis points to – that Ms. Landherr ran the disconnected calls report for the first time in May 2018, that Ms. Landherr was not aware of a "workforce audit group," that Ms. Landherr reported the disconnected calls to Mr. DeSimone even though he is not a director, that no one checked to see if Ms. Davis was having technology issues, and that a timesheet discrepancy was the initial focus but was not pursued – do not indicate that Met P&C's reason for terminating Ms. Davis was a pretext for retaliation.  While some of this evidence, particularly evidence relating to the sufficiency of Met P&C's investigation, may show that the decision to terminate Ms. Davis could have been more thorough – e.g., that Met P&C did not adequately inquire regarding whether Ms. Davis had technology issues – it still does not show that Met P&C did not honestly believe that Ms. Davis was disconnecting calls.

In short, Ms. Davis has not provided evidence from which a reasonable jury could conclude that her request for a sit-stand desk was the cause of her termination, or that Met P&C's reason for terminating her was pretext for retaliating against her based on her request for a sit-stand desk. The Court **GRANTS** Met P&C's Motion for Summary Judgment on Ms. Davis's ADA retaliation claim.

## IV.
### CONCLUSION

Although there may be a genuine issue of material fact regarding whether Ms. Davis intentionally disconnected customer calls, none of the evidence that Ms. Davis has presented raises a doubt that Met P&C believed that she had in fact done so.  Because Ms. Davis has not shown that Met P&C's decision to terminate her for call avoidance and call abandonment was a pretext for discriminating or retaliating against her based on her disability, and since Ms. Davis did not respond to Met P&C's arguments regarding her ADEA discrimination claim, the Court **GRANTS** Met P&C's Motion for Summary Judgment, [56].  Final judgment shall enter accordingly.

Date: 5/5/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record</u>**